KUTSCHINSKI v. ZANK.

1. APPEAL AND ERROR—CHANCERY CASE—DE NOVO REVIEW.

On *de novo* review of chancery suit for specific performance of contract wherein questions presented for determination of trial court were whether or not plaintiff had established existence of alleged contract and full performance thereof, the same questions are considered.

2. SPECIFIC PERFORMANCE—CONTRACT TO LEAVE PROPERTY—PERFORMANCE—EVIDENCE.

In suit for specific performance of contract by father, now deceased, to leave property to plaintiff in return for her

services in nursing and doing housework for her invalid mother over a period of years, testimony, even after elimination of inadmissible testimony of conversations with mother not in the presence of her father and testimony as to matters equally within knowledge of deceased father, was sufficient to establish contract and plaintiff's performance thereof (3 Comp. Laws 1929, § 14219).

3. SAME—CONTRACT TO LEAVE PROPERTY—LACHES.

In suit for specific performance of contract by plaintiff's father where contract alleged and proven was that in return for plaintiff's services in nursing and keeping house for her invalid mother for a number of years prior to death of latter, certain property would be left to plaintiff upon the death of the survivor of father and mother, plaintiff was not guilty of laches in waiting until both had died since she was not entitled to possession until then.

4. EQUITY—LACHES—LAPSE OF TIME.

Laches is purely an equitable defense and lapse of time alone will not create it, it being necessary to show other circumstances in addition to lapse of time that would make it inequitable to grant the relief sought.

5. SPECIFIC PERFORMANCE—CONTRACT TO LEAVE PROPERTY—PURCHASER IN GOOD FAITH.

In suit for specific performance of a fully-executed express contract by plaintiff's father, where it appears that after the death of plaintiff's mother, and father's marriage to defendant, he recognized his obligation to plaintiff but nevertheless placed title where instant suit had to be brought, such action constituted a lack of good faith and a breach of contract as did his failure to provide for plaintiff in his will and since defendant gave no consideration therefor and participated in the fraud against plaintiff, defendant is not in the position of a purchaser in good faith.

Appeal from the Superior Court of Grand Rapids; Taylor (Thaddeus B.), J. Submitted October 13, 1943. (Docket No. 59, Calendar No. 42,523.) Decided November 29, 1943.

Bill by Frieda Kutschinski against Emma J. Zank and another to set aside deeds and to compel specific performance of a contract to convey land. Decree for plaintiff. Defendants appeal. Affirmed.

*Linsey, Shivel, Phelps & Vander Wal,* for plaintiff.

*Smith, Strawhecker & Wetmore,* for defendants.

CHANDLER, J. Plaintiff filed a bill for specific performance of an oral contract with her father William L. Zank, deceased, made in 1923, in which it was agreed that if she and her husband would move into a house to be constructed by Mr. Zank on Clancy street in the city of Grand Rapids on a vacant lot then owned by him, and would care for his wife, mother of plaintiff, an invalid, as long as Mrs. Zank should live, that upon the death of the survivor of Mr. and Mrs. Zank, she, plaintiff, should have said property as compensation for her services in caring for and nursing her invalid mother during her lifetime.

The plaintiff was an only child of Mr. and Mrs. Zank and was married to her present husband, Theodore Kutschinski, in 1917. She and her husband made their home with her parents until his return from the first world war in 1919, when they moved with their two children into a house a short distance from her parents. The mother was then suffering from a heart ailment and was able to do but little of her housework and this condition continued until her death in February, 1930. Plaintiff went to her mother's house daily to assist her in her housework and to nurse her at times when she was confined to her bed, until both families moved into the new home constructed by Mr. Zank on Clancy street in 1923.

At this new home, plaintiff continued to care for and nurse her mother in addition to doing practically all the household work, such as washing,

ironing, cooking and cleaning, until her mother's death, and from then on, until the remarriage of her father, to appellant herein, in September, 1931, she cared for her father's rooms as she had been doing theretofore. During this latter period, the father had most of his meals with plaintiff and her family. During the entire occupancy of the premises in question by plaintiff and her family, plaintiff's husband paid rental to Mr. Zank therefor pursuant to agreement between them, part of the time at the rate of $25 per month and part of the time at the rate of $20 per month.

After the marriage of Mr. Zank to appellant, the two families continued to live in the same house until January, 1935, when plaintiff and her husband moved out following a quarrel between her father and Mr. Kutschinski.

Mr. Zank died in April, 1941, without making any provision for the consummation of the alleged contract between himself and his daughter. On the contrary, it appears that in February, 1936, he placed the premises in question, together with all other real estate he then owned, which was of no inconsiderable value, in the names of himself and appellant as tenants by the entirety, and his bank account and securities in the joint names of himself and wife, the bank account alone according to admissions of appellant being in the approximate amount of $15,000.

The trial court granted plaintiff the relief prayed for in her bill of complaint, and from the decree entered defendant Emma J. Zank appeals.

Defendant Lillie claims no interest in the property in question. He merely permitted the use of his name as a means of conducting the title thereto from Mr. Zank to Zank and wife, Emma.

As we view the situation here presented there were but two questions presented to the trial court for his. determination, namely:

(1) Did the proof establish the existence of a contract between plaintiff and her father as alleged in her bill of complaint?

(2) Did the plaintiff establish by competent evidence full performance of said contract, if one existed, on her part?

The court below answered both questions in the affirmative.

The review here sought being *de novo,* the same questions are now before us for our consideration and determination.

We call attention to the testimony of but a few of many witnesses who gave testimony in behalf of plaintiff tending to establish the existence of the contract on which she relies.

Theodore Kutschinski, husband of plaintiff, without objection testified as follows:

"In the latter part of 1922 it came to our attention that Mr. and Mrs. Zank were talking of having us come to live with them. I found that out from my wife. Right after the holidays in 1923 they first came out with the proposition. It was at their home. All four of us were present. Mr. Zank said, 'What do you think about this? Now Frieda has got to run back and forth here each day with the children to look after her mother and take care of things that she needs' done, and so forth, and it is quite a chore with the small children. What would you think of a proposition like this, that we build a two-family home, where we can be together and Frieda do her mother's work and look after her needs and take care of her in illness, and when we die she is to have that home for it.' My wife and I said that naturally we were looking forward to some day having a home of our own and an agreement

like this surely provided it and we were perfectly agreed on going into the proposition under those conditions. At that time I did not know about the purchase of the lot on Clancy Street. Mr. Zank told me about it then, and said he wanted to put up a double house for both of us, and then told of the contract.

"*Q.* Was there anything more said on that particular day that relates to this agreement that you remember?

"*A.* Well he says 'We will plan it out,' he says 'You go ahead and figure it out. I want the house to be 28 by 40,' and he said 'You got to figure to get all the rooms in there so you have enough room for your family,' and that I done. I sketched it up, figured it out and later even went with him to a contractor and which didn't accept the job, and then I later took the sketch to another building contractor who resketched the thing in proper form from my plan and I had sketched for him according to his desires.

"*Q.* Am I to understand you drew up some plans there that day you had the talk or later?

"*A.* Later, I didn't do it right then; he gave me the outline of what he had in mind and he said 'You figure it out.'

"*Q.* Did you confer with him frequently about it?

"*A.* Yes, and when I had it completed I showed it to him and he thought it was all right.   *   *   *

"*Q.* About when was it completed and ready for occupancy?

"*A.* In July, 1923.

"*Q.* And did you move into it?

"*A.* Yes, sir.

"*Q.* And did your in-laws move in?

"*A.* Yes, sir.

"*Q.* And did you people move into this house?

"*A.* On July 13, 1923. We had the downstairs and they had the upstairs. We lived there until

January, 1935. After we moved in my wife looked after her mother. I only remember twice that her mother was down town. She wasn't able. At one time she was forbidden by the doctor to do any work. She sat in a chair and when she wanted anything pounded on the floor. If she dusted the furniture she could not get her breath. She could get up and down stairs but she didn't very often. My wife did the shopping, the washings and the housework and part of the cooking. Mrs. Zank did it the rest of the time. My wife did most of the shopping. Mr. Zank sold out his interest in the business in 1927 or 1928. He told me he got $34,000 for it. Johanna Zank died February 9, 1930. Prior to that time she was often sick in bed and helpless and under the care of a doctor. My wife took care of her. My wife was her only child. In February, 1929, William Zank told me, in the presence of Mrs. Zank, that they had made their wills that afternoon.

"*Q.* What did William L. Zank say?

"*A.* 'We made our wills this afternoon,' he says 'You want to see it?' He was going to go in and get it out and let me read it. I said, 'No, I am not interested. I know you are honest and you have taken care of everything. I don't even want to see it'; there was no reason for me to doubt anything.

"*Q.* He offered to show it?

"*A.* He offered to get it out and show it to me and I declined, I didn't even want to read it. * * * Before we moved into the house I was paying rent and he suggested that I continue paying the same rent, $25 a month, saying that the more we paid the more we would get back and we would get it all back some day anyway. During the depression the rent was reduced to $20 a month."

Mrs. Anna Bayer gave the following testimony:

"I live at 811 Clancy. My husband is dead. We knew William Zank and his first wife and had known her for 40 years and known him from the

time of his marriage, which took place at my mother's house. They moved onto Prospect street. After that, for five years, I lived on the west side of Grand Rapids and then moved on to Clancy near where the Zanks were living on Prospect, and from that time on knew them intimately until they died. We probably saw them every evening while they lived on Prospect and every day when they lived on Clancy. When they lived on Prospect we were about three blocks away and then when they lived on Clancy we were four houses apart. We were close neighbors and saw them frequently. I remember when Mr. Zank built the house on Clancy street. I had a conversation about holiday time, 1922, with Mrs. Zank with reference to the building of that house. The conversation took place in her home on Prospect.

"*Q.* Will you tell that conversation?

"*Mr. Smith:* I renew our objection. The property belonged to Mr. Zank. There was no contract alleged with Mrs. Zank and any conversation with her would be entirely incompetent and hearsay.

"*The Court:* On the basis of the former ruling we will take the testimony.

"(Witness continuing):

"Mrs. Zank told me she had a surprise for me; that they were going to move close to our place. She said, 'I won't say that, why—you know how I am,' but she said 'We are building a home for Frieda near your place.' She said that Frieda would have to come to do her work where she was then and it was too far to take her little children and come over and tend to her, and that her health was getting worse right along and she would have to have help and didn't want anybody else but Frieda to do it. I then asked her why she didn't build two houses, one for herself and one for Frieda and she said they better live in one house, she would live upstairs and Frieda would live downstairs, because she had the little kids. My husband was present at that conver-

sation. In the spring of 1923 I had a conversation with Mr. Zank about the house. My husband and I were sitting on the porch and he came past and asked us to come over and look at the place. He said, 'Come over and look at Frieda's house we are building for her.' We walked through it. No plastering had been done, and he showed us the different rooms. Mrs. Zank was not there. I said to him, 'Why, Bill, what do you want to build such a big house for?' He said, 'Got to have quite a few rooms for Frieda and the kids. I am going to live upstairs—with Hanna's sickness she won't have to do much because Frieda is going to do the work for us so that will take care of everything else fine.' Then we got to talking one to the other, and he said 'We are building this house for Frieda, for Frieda, remember. I made a contract with them that they are to have the house because Frieda is going to take care of Johanna.' I said 'Not Ted?' He said, 'It is Frieda's gift for taking care of Hanna.' Those were his exact words. My husband said, 'The kid deserves it because she is doing all she can.' Mr. Zank said, 'Yes, she does.' That is all I recall of that conversation."

Albert Huzel testified that he had talked a number of times with William L. Zank about his arrangement with his daughter Frieda. One occasion stood out in his memory, and the following is his testimony:

"*Q*. When was the first time that you ever had any talk with him about it, as well as you remember it?.

"*A*. Well the most pronounced time was, oh it was shortly after Johanna Zank died, and Mr. Zank was eating his meals downstairs with Mr. and Mrs. Kutschinski, and we had had—I don't know whether you want me to go into details or not—he used to come with Mr. and Mrs. Kutschinski up to

our house for a meal, and naturally that included Mr. Zank and he was there and that was the first time that Mr. Zank had been into my new home.

"*Q.* Where was this new home, on Elmwood?

"*A.* On Elmwood Street, yes. Then after the folks were up there I was over to Kutschinski's and Mr. Zank had a garden out in the back yard, and he was very proud of that garden, and he called me and said, 'Al, I want you to come out here and see this garden,' so I went out there back of the garage, we looked things over there and that was at that time in particular that we got to talking about that home on Clancy Street.

"*Q.* That is where they were living?

"*A.* Yes, where they were living, and he said, 'Al, you got a very nice home,' and he says, 'Some day Ted and Frieda,' the way he talked, he said 'Ted and Frieda are going to have a nice home too.' I said, 'How is that?' Well, he said, *'I got it all fixed, I got a contract that Frieda gets this place when I die for taking care of her mother all those years.'*" (Italics ours.)

Fred Hammel testified as follows relative to a conversation that he had with William L. Zank about two years before the first Mrs. Zank died:

"I complimented him on having such a nice home, and it was fixed up so beautifully, and so on, and he said, 'Yes, it is. I fixed it with the intentions that Mrs. Kutschinski (Frieda) would have it for taking care of her mother and for helping us.' I said, 'It is wonderful when people can do those things,' and he said, 'Well, that is the way it is.'"

George F. Kutchin, a cousin of appellee's husband, called at the Zank home after William L. Zank's second marriage, he testified:

"About three weeks after this second marriage I told him I supposed he was going to live down-

stairs and he said, 'No, Ted and Frieda are going to stay here as long as they like, because I have got everything on paper fixed for them.' He said, nothing is going to be changed, everything is on paper and is going to stay that way.''

Numerous other witnesses gave testimony corroborative of that hereinbefore quoted. This testimony convinced the trial court and is conclusive to our minds that every essential element necessary to the establishment of a valid executed contract is present, and that the burden of establishing such contract by competent evidence has been met by plaintiff.

We find that in but few, if any, of the many similar cases that have been before this court for review, has evidence of the facts necessary to establish a valid contract between a parent and a child been more convincing than in the instant case. We, therefore, refrain from quoting from or citing authorities in support of our conclusion that a valid contract is established between plaintiff and her father.

The question as to whether the plaintiff has established full performance of the contract on her part by competent evidence needs no discussion. Performance on her part is so convincingly established by the record that counsel for appellant on the oral argument before this court stated: ''If a valid contract is established in this case, we concede performance on the part of plaintiff.''

Other questions are raised by appellant which we will briefly discuss.

Defendant contends that statements made by plaintiff's mother, not in the presence of William L. Zank, relative to the disposition to be made, or that had been made, of the property of the husband, were inadmissible; also, that plaintiff was permitted

to testify to matters equally within the knowledge of her deceased father* and that this constituted error which would justify a reversal of the case.

It is our opinion that these statements made by the mother not in the presence of her husband are inadmissible, and further that plaintiff did testify to some matters that were equally within the knowledge of her deceased father. However, we find nothing in the opinion of the trial court that he either based his decision on or was influenced in any way in his findings and conclusion by the testimony relating to conversations which were had with the mother in the absence of Mr. Zank, or that he was influenced or based his decision on any testimony given by plaintiff herein. Eliminating this-inadmissible testimony in its entirety from the record, we arrive at the conclusion that there was a contract between plaintiff and her father, and that there was full performance of said contract on the part of the plaintiff.

Defendant also contends that the plaintiff is estopped from maintaining this action because she was guilty of laches in delaying suit until after her father's death. We reach the conclusion that plaintiff could not maintain this action for specific performance during the lifetime of her father. Under the contract alleged and proven she was not entitled to possession of the property during the lifetime of her father and mother, and she was not guilty of laches in delaying this action until after their death. There was no delay in the institution of this suit for specific performance because plaintiff had no right to the possession of the premises or to the title thereto until after the death of her father. Furthermore, laches is purely an equitable defense and

---

* See 3 Comp. Laws 1929, § 14219 (Stat. Ann. § 27.914).—RE-PORTER.

lapse of time alone will not create it. There must be other circumstances than mere lapse of time that would make it inequitable to grant the relief sought. In the instant case there are shown no circumstances that created a change in conditions to the prejudice of appellant.

Appellant also contends that the subsequent conveyance of the property, and the father's specific refusal to mention his daughter in his will, destroyed the implications of an existing contract. This suit is not on an implied contract. The record shows that an express contract existed, and the mere fact that the decedent placed the title to these premises where the appellee had to bring suit for specific performance is evidence of a lack of good faith and a breach of contract on his part. After decedent's second marriage, he continued to recognize the existence of his contract with his daughter until 1936 when by will and deed he attempted to place it where appellee would be defeated in an effort to enforce performance.

Appellant is not in the position of a purchaser in good faith for value in reliance on the record title. She had notice of the contract in question. The conveyance to her was purely voluntary. She gave no consideration therefor, and cannot now assert any interest in the property in question either by way of dower or as the survivor of a tenancy by the entirety as a result of the fraud perpetrated by decedent to which she was a party.

We find no other questions raised that merit discussion, and being thoroughly convinced of the correctness of the trial court's findings of fact and conclusion of law, the decree entered is affirmed, with costs to appellee.

BOYLES, C. J., and NORTH, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.